647 So.2d 134 (1994)
PSYCHIATRIC ASSOCIATES, a professional association, Alvin Neumeyer, M.D., Eugene Valentine, M.D., and Frank Gill, M.D., Appellants,
v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, Appellee.
No. 92-3279.
District Court of Appeal of Florida, First District.
April 18, 1994.
*135 H. Edward Moore, Jr., Moore, Hill, Westmoreland, Hook & Bolton, P.A., Pensacola, for appellants.
Dale J. Paleschic, Parker, Johnson, Anderson, Goodwin, McGuire & Michaud, Orlando, for appellee.
WEBSTER, Judge.
Appellants (the insureds) seek review of a summary final judgment entered in favor of appellee (the insurer) in a declaratory judgment action. They argue that the trial court erroneously concluded that the insurer had no obligation to provide a defense for them because the policy issued by the insurer afforded no coverage as to claims made against them by a third party in a civil action. We agree with the insureds and, accordingly, reverse.
In its second amended complaint, the insurer alleged that it had issued to the insureds two policies  a "Professional Office Package" and an "Umbrella Excess Liability Policy"  attaching a copy of each. It also alleged that a civil action had been filed against the insureds by Edward A. Siegel, M.D.; attaching a copy of the amended complaint filed by Siegel. According to the insurer's complaint, the insurer was unsure of its legal rights and responsibilities under the two policies because (1) Siegel's complaint alleged "intentional acts of wrongdoing" by the insureds, and both policies provided coverage only for "an accidental event which results in damage which the insured did not expect or intend to happen"; (2) Siegel's complaint alleged that he had been harmed as a result of acts of the insureds performed in their professional capacities, and both policies "excluded coverage for acts done in the course of performing professional services"; and (3) certain of the claims made by Siegel involved allegations of violations by the insureds of federal and state criminal laws, and both policies excluded coverage for injuries resulting from intentional violations of any criminal law. The insureds answered, admitting that they believed that both policies afforded coverage for the claims made by Siegel; and denying all of the remaining material allegations.
Siegel's complaint against the insureds consists of five relatively unartfully drafted counts. It contains the following material allegations: The insured professional association had a contract with Gulf Coast Treatment Center, Inc. (the Treatment Center) to provide psychiatric medical care and administrative services to HSA Gulf Coast Hospital *136 (the Hospital). The individual insureds were all agents or employees of the professional association. Siegel entered into a contract with the Treatment Center to engage full time in the practice of psychiatry at the Hospital. The insureds "intentionally and unjustifiably sought, at medical staff meetings and otherwise, to interfere with the contractual relationship between" Siegel and the Treatment Center by attempting to block Siegel from assuming his position on the staff of the Hospital; attempting to restrict Siegel's privileges; making false accusations in an attempt to have Siegel's privileges suspended; forcing Siegel to leave treatment team meetings at which his patients were being discussed; and having the furniture and "therapeutic tools" removed from Siegel's office. Counts I and II allege, further, that, as a result of the insureds' actions, Siegel "suffered mental and emotional anguish, loss of capacity for the enjoyment of life, expense of medical care and treatment, loss of earnings, and loss of the ability to earn money." Relying upon the foregoing allegations, Count I seeks damages for "intentional interference with an advantageous business relationship"; Count II seeks damages for "intentional infliction of emotional distress"; Count III seeks damages for violations of section 1 of the Sherman Anti-trust Act (15 U.S.C. § 1); Count IV seeks damages for violations of section 2 of the Sherman Anti-trust Act (15 U.S.C. § 2); and Count V seeks damages for violations of the Florida Antitrust Act (ch. 542, Fla. Stat.).
Both policies are comprehensive general liability policies, covering a number of different risks. The following provisions of the "Professional Office Package" are relevant to this appeal:
What This Agreement Covers
Liability coverage. We'll pay amounts you and others protected under this agreement are legally required to pay as damages for covered bodily injury, property damage, personal injury or advertising injury claims caused by an event.

Event means an accidental event that results in bodily injury or property damage the protected person didn't expect or intend to happen. An event also means an act or a series of similar or related acts that results in personal injury or advertising injury.
... .

Personal injury means any of the following acts of interference with rights that happen in the course of your business while this agreement is in effect:
 false arrest, wrongful detention, malicious prosecution, humiliation or false imprisonment;
 libel, slander, defamation of character, or invasion of an individual's right of privacy. But not such acts that arise from advertising activities; or
 wrongful entry, wrongful eviction or other invasion of the right of private occupancy.
... .
Exclusions-Claims We Won't Cover
... .
Professional services. We won't cover injury or damage resulting from the performance of or the failure to perform any professional service.
This exclusion applies whether or not the claim is based on liability assumed under any contract or agreement.
... .
Personal injury. We won't cover personal injury claims in these situations:
... .

Deliberately breaking the law. We won't cover personal injury claims that result if you or other protected persons knowingly break any criminal law. Or if someone else breaks such law with the consent or knowledge of any protected person.
The coverage provisions of the "Umbrella Excess Liability Policy" are substantively identical to those of the "Professional Office Package." However, the exclusions contained in the former are somewhat different from those contained in the latter. The "Umbrella Excess Liability Policy" does not have a "deliberately breaking the law" exclusion; and the exclusion comparable to the "professional services" exclusion reads:
Professional Medical Services. We won't cover injury or damage due to providing or failure to provide:

*137  medical, surgical, dental, x-ray, nursing service or treatment, or the serving of food or beverage within these services;
 any service or treatment related to health or of a professional nature;
 any cosmetic or tonsorial service or treatment;
 drugs, medical or dental supplies or appliances; or
 the handling of corpses or the performance of autopsies.
This exclusion won't apply to coverage provided by the Umbrella Excess Hospital Professional Liability Protection  Claims Made.
It is somewhat difficult to ascertain upon which precise portions of the policies the insurer is relying. In its complaint, it took the position that there was no coverage because Siegel's complaint alleged (1) "intentional acts of wrongdoing" by the insureds; (2) that the acts were "done in the course of performing professional services"; and (3) that the insureds had "intentionally violated ... criminal laws." However, in its motion for summary judgment, it asserted that it was entitled to a summary judgment because Siegel's complaint alleged that the insureds had "committed various intentional acts as well as violations of ... criminal laws." There is no mention of the "professional services" exclusion. Then, at the hearing on the motion for summary judgment, the insurer conceded that the wrongs alleged in Siegel's complaint might be within the policies' coverage but for certain exclusions:
The policy does provide some additional coverage for personal injury which arises and the policy defines as false arrest, libel, slander, wrongful injury, wrongful eviction. Admittedly there may be some chance that this provision applies to the complaint. However, there are exclusions which do not allow the policy coverage to kick in. There's an exclusion for deliberately breaking the law ... as well as there's an exclusion for failing to render professional services.
(Emphasis added.)
The confusion regarding the insurer's position has been multiplied by its stances in this court. In its brief, the insurer relied exclusively upon the "professional services" exclusion, essentially conceding that, but for that exclusion, the claims made by Siegel would fall within the terms of the "personal injury" coverage. However, at oral argument, the insurer again shifted positions, arguing that, even absent the "professional services" exclusion, Siegel's claims would not come within the terms of the "personal injury" (or any other) coverage.
An insurer's duty to provide a defense is determined by examining the allegations of the complaint. National Union Fire Ins. Co. v. Lenox Liquors, Inc., 358 So.2d 533 (Fla. 1977). "All doubts as to whether a duty to defend exists in a particular case must be resolved against the insurer and in favor of the insured." Grissom v. Commercial Union Ins. Co., 610 So.2d 1299, 1307 (Fla. 1st DCA), review denied, 621 So.2d 1065 (Fla. 1993). "[T]he duty to defend is far broader than the duty to pay." State Farm Mut. Auto. Ins. Co. v. Universal Atlas Cement Co., 406 So.2d 1184, 1188 (Fla. 1st DCA 1981), review denied, 413 So.2d 877 (Fla. 1982). Accordingly, if the complaint, fairly read, contains any allegations which could fall within the scope of coverage, the insurer is obliged to defend the entire action. Morgan Int'l Realty, Inc. v. Dade Underwriters Ins. Agency, Inc., 617 So.2d 455 (Fla. 3d DCA 1993); Tropical Park, Inc. v. United States Fidelity & Guar. Co., 357 So.2d 253 (Fla. 3d DCA 1978).
Both of the policies in question extend coverage to amounts (up to the policy limits) which the insureds are "legally required to pay as damages" for "an act or a series of similar or related acts that results in personal injury." It is not necessary, for purposes of "personal injury" coverage, that the act or acts be "accidental" (i.e., there is no intentional acts exclusion as to this coverage). As used in the policies, the phrase "personal injury" has a meaning different from that most often associated with it. It includes, among other "acts of interference with rights," "humiliation," "libel," "slander" and "defamation of character" "that happen in the course of [the insureds'] business." As we have previously noted, Siegel's complaint *138 is relatively unartfully drafted. Nevertheless, we believe that, fairly read and resolving all doubts in favor of the insureds, at least some of the wrongs alleged in Siegel's complaint fall within the "personal injury" coverage of the policies.
At oral argument, the insurer asserted that St. Paul Fire & Marine Ins. Co. v. Naples Community Hospital, Inc., 585 So.2d 374 (Fla. 2d DCA 1991), stands for the proposition that the wrongs alleged in Siegel's complaint do not come within the scope of the "personal injury" coverage. The policies in that case did include "personal injury" coverage similar to that included in the policies in this case. However, we conclude that Naples Community Hospital is distinguishable from this case on its facts and, therefore, is not controlling.
In Naples Community Hospital, the insureds had been sued by another hospital. The complaint included allegations that the insureds had conspired to interfere with the plaintiff's business relationships and to engage in the unreasonable restraint of trade for the purpose of preventing the plaintiff from obtaining a certificate of need to build a new hospital. The complaint alleged "that there were `joint efforts to create publicity adverse' to" the plaintiff, and that the insureds had "provided `false information' in the evidence presented to the hearing officer." 585 So.2d at 375-76. Notwithstanding such allegations, the court concluded that there was no coverage because the allegations were insufficient to establish that the claims were based upon slander or defamation; and, therefore, to come within the scope of the "personal injury" coverage. However, the court based its conclusion upon two factors, neither of which is present here. First, it noted that a corporation has no reputation in the sense that an individual does and, therefore, has a much more limited right of action for slander or defamation than does an individual. A corporation can be injured by a false or defamatory publication only as to its credit, property or business. None of the plaintiff's allegations had suggested an injury to its credit, property or business. Second, the court pointed out that the plaintiff did not seek damages for injury to its reputation. It sought lost profits and other items. Unlike the situation in Naples Community Hospital, in this case we believe that Siegel's complaint may fairly be read as alleging that he has suffered mental and emotional anguish, humiliation and injury to his reputation as a result of the insureds' actions.
Having concluded that at least some of the allegations of Siegel's complaint may fairly be read as alleging wrongs covered by the "personal injury" provisions of the policies, we must now determine whether either of the exclusions asserted at one time or another by the insurer as precluding coverage applies. Clearly, not all of the wrongs alleged by Siegel may be classified as deliberate violations of the criminal law. Even the insurer appears now to concede as much. Accordingly, the "deliberately breaking the law" exclusion is not applicable. We conclude that the "professional services" exclusion is, likewise, inapplicable.
The insurer argues for a very broad construction of the "professional services" exclusion. It contends that it should be applied to any activities in any way related to the practice of the individual insureds' profession of psychiatry. We are unable to accept such a broad reading of this exclusion.
Because they tend to limit or avoid liability, exclusionary clauses are construed more strictly than coverage clauses. Moreover, if the former are ambiguous or susceptible to more than one meaning, they must be construed in favor of the insured and coverage. Allstate Ins. Co. v. Shofner, 573 So.2d 47 (Fla. 1st DCA 1990). To construe the "professional services" exclusion as the insurer urges would result in the virtual emasculation of the policies, which are clearly intended to provide liability coverage for many different types of risks associated with the insureds' business. In our opinion, it would also be inconsistent with the language used, particularly that used in the "Umbrella Excess Liability Policy." That language states, in what we believe to be relatively clear terms, that it is intended to exclude from coverage only acts of professional malpractice. Siegel's complaint does not contain any allegations of professional malpractice by the *139 insureds. See United States Fidelity & Guar. Co. v. Buckner, 425 So.2d 1160 (Fla. 3d DCA 1983) (claim that insured physician hospital board members had conspired to injure medical practice of plaintiff physicians did not involve claim of injury resulting from the performance of "professional services"); Buckner v. Physicians Protective Trust Fund, 376 So.2d 461 (Fla. 3d DCA 1979) (claim that insured physician acting as investigator for Board of Medical Examiners had slandered plaintiff physicians at press conference alleged an intentional tort which did not arise out of performance of "professional services").
Based upon the preceding analysis, we conclude that it was error to enter a summary final judgment in favor of the insurer. Accordingly, we reverse and remand for further proceedings consistent with this opinion.
REVERSED and REMANDED, with directions.
SMITH, J., concurs.
BOOTH, J., dissents with written opinion.
BOOTH, Judge, dissenting.
The trial court correctly determined that the policy was not intended to afford liability coverage for the actions alleged in the complaint.